# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

INDEPENDENT SCHOOL DISTRICT
NO. 413, MARSHALL,

               Plaintiff,

v.

H.M.J., *by and through her parents, A.J. and M.N.*,

               Defendant.

Civil No. 14-2114 (JRT/HB)

**MEMORANDUM OPINION
AND ORDER ON CROSS
SUMMARY JUDGMENT
MOTIONS**

---

Ashley R. Geisendorfer, Christian R. Shafer, and Nancy E. Blumstein, **RATWIK ROSZAK & MALONEY, PA**, 730 Second Avenue South, Suite 300, Minneapolis, MN 55402, for plaintiff.

Margaret O'Sullivan Kane, **KANE EDUCATION LAW, LLC**, 420 Summit Avenue, Suite 306, St. Paul, MN 55102, for defendant.

This action involves an eight-year-old child, Defendant H.M.J. ("H.J."), who experiences anxiety and other lingering health conditions from undergoing chemotherapy for lymphoma as a toddler. She attends school in the Marshall School District ("the School District," or "the District"). On October 8, 2013, H.J.'s mother and father, M.N. and A.J., requested an administrative due process hearing to challenge the School District's failure to timely conduct a sufficiently comprehensive special education evaluation for H.J. Following the due process hearing, Administrative Law Judge James Mortenson ("ALJ Mortenson" or "the ALJ") ruled that the School District did not conduct an adequate evaluation. Specifically, the ALJ concluded that the School District

should have proposed or obtained a medical evaluation related to H.J.'s excessive absenteeism from school.

On June 23, 2014, the School District filed a complaint with this Court pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), appealing the ALJ's order. This matter is now before the Court on the parties' cross motions for judgment on the administrative record. Having reviewed the full administrative record, the Court concludes that the ALJ correctly ordered the District to obtain a medical assessment of H.J., pursuant to Minnesota Rule 3525.1335. Thus, the Court will order the parties to follow the ALJ's order, including that the School District obtain a medical assessment of H.J. and analyze the Other Health Disabilities ("OHD") criteria as they apply to her.

## BACKGROUND

### I.   H.J.'S HEALTH AND ABSENCES

#### A.   Cancer and Continuing Illnesses

H.J. is an eight-year-old girl who was diagnosed with anaplastic large cell lymphoma in 2007 at the age of nineteen months. (Summ. of Neuropsychological Evaluation ("Neuropsychological Eval."), Pl. Ex. 1 at P1, Mar. 30, 2012; Lee Letter, Pl. Ex. 2 at P12, Sept. 18, 2012.)[1] She underwent chemotherapy for one year, ending in

---

[1] Unless otherwise specified with a docket number, each exhibit was submitted to the ALJ as part of the administrative record at the due process hearing. Because the parents initiated the underlying proceeding, a designation of "Pl. Ex." refers to an exhibit offered by H.J.'s parents at the hearing, and "Def. Ex." refers to an exhibit offered by the School District.

August 2008. (Neuropsychological Eval. at P1.) She has remained in remission for the last six years. (Lee Letter at P12.)

Despite remaining in remission, H.J. continues to have frequent illnesses and infections. (Neuropsychological Eval. at P1.) These conditions range from fevers, coughs, and colds, to constipation, bilateral lower extremity weakness, recurrent urinary tract infections, gastroesophageal reflux, insomnia, and anxiety. (*E.g.*, Minn. Amplatz Children's Hospital Long-Term Follow Up Clinic Record ("Amplatz Follow Up R."), Pl. Ex. 3 at P13-P14, P18, Aug. 23, 2013.) H.J. has also been treated for asthma, (Avera Medical R., Pl. Ex. 11 at P31-P36, Nov. 26, 2013), and has tested positive for pertussis, (Pediatrics Pulmonary Provider Note, Pl. Ex. 39 at P181-P182, Mar. 5, 2014).

Anxiety appears to be the predominant condition impacting H.J.'s health. In February 2012, when H.J. was in kindergarten, her parents took her to the Pediatric Neuropsychology Clinic at the University of Minnesota Medical Center Fairview ("the Neuropsychology Clinic"). (Neuropsychological Eval. at P1.) The Neuropsychology Clinic listed the reason for the visit as: "to assess her current neurobehavioral functioning in light of recent difficulties with anxiety." (*Id.*) The District provided a "school information form" as part of the evaluation, in which the social worker at H.J.'s elementary school "noted that she has observed [H.J.] to 'act insecure, distracted, and anxious at school.'" (*Id.* at P2.) The Neuropsychology Clinic ultimately diagnosed her on March 30, 2012 with "Generalized Anxiety Disorder" and made several specific recommendations about strategies for addressing H.J.'s anxiety in both a home and school setting. (*Id.* at P1, P5-P6.) H.J.'s mother provided a copy of the final evaluation

to the school, and several District personnel read the report. (Email Exchange Between Pfeiffer, Ulrich & Hess, Def. Ex. 81 at 142, April 19, 2012.)

One health care provider identified H.J.'s chemotherapy as a possible source of the anxiety she now experiences. Jill Lunsford Lee, a Pediatric Nurse Practitioner at the University of Minnesota Amplatz Children's Hospital Long Term Follow Up Clinic for childhood cancer survivors, noted in a letter describing H.J.'s condition that she "has developed some long term side effects from her [chemotherapy] treatment which include generalized anxiety disorder . . ." (Lee Letter at P12.) The Neuropsychology Clinic's report mentions that "difficulties with attention and memory can be secondary to the negative, long-term effects of chemotherapy." (Neuropsychological Eval. at P4.) The evaluation did not, however, attempt to identify a specific cause for H.J.'s heightened anxiety.

### B.     Impact of Health Concerns on Academic Performance

When H.J. started kindergarten in the School District, her anxiety manifested in symptoms that disrupted her academic progress. One primary symptom was that H.J. exhibited separation anxiety when her mother would drop her off at school. She enrolled in therapy with Jari Johnson, M.A., LMFT, in September 2011 "due to concerns regarding difficulty separating from her mother in the morning at school. According to Ms. Johnson's diagnostic assessment, [H.J.] would 'scream and have a fit' when [her mother] dropped her off at school, with school staff requiring 20 minutes to calm her down." (Neuropsychological Eval. at P2.)

H.J.'s separation anxiety in the mornings continued during first grade, when her parents would accompany her to the classroom. (Tr. at 591 (Test. of Julie Allen ("Allen Test."))); Email Exchange between Allen and Ulrich, Def. Ex. 97 at 169, Sept. 4, 2012; Email Exchange between M.N. and Allen ("M.N.-Allen Email"), Def. Ex. 101 at 173.) When M.N. would leave the classroom, there was sometimes "a separation scene," (Note from Substitute Teacher, Def. Ex. 99 at 171, Sept. 6, 2012), and H.J. would cry, (Tr. at 591-92 (Allen Test.); M.N.-Allen Email at 173.)

In addition to separation anxiety in the mornings, H.J. would demonstrate anxiety and frequently report feeling physically ill from headaches or stomachaches throughout the day. (Pediatric Neuropsychology School Information Form, Def. Ex. 53 at 82, Feb. 6, 2012; Pfeiffer Letter, Def. Ex. 57 at 88-89, Feb. 7, 2012.) At times, she would request to go to the nurse's office at least three times a day. (Notes from Parent-Teacher Meeting, Def. Ex. 92 at 163, Aug. 23, 2012.) The school nurse at H.J.'s elementary school reported that H.J. sometimes "seem[s] so nervous, and wants to have mom called and go home. Sometimes [she] is just convinced she is going be sick." (Pfeiffer Letter at 88.) The evaluation performed at the Neuropsychology Clinic linked these somatic complaints to her condition of Generalized Anxiety Disorder. (Neuropsychological Eval. at P4.)

Sometimes due to anxiety or illness and sometimes for various other reasons, H.J. missed a substantial amount of school from kindergarten through second grade.[2] In

---

[2] (E.g., Tr. at 612 (Allen Test.) (describing absences for urinary tract infection and a cold); id. at 615-20 (describing absences for grandfather's doctor's appointment, H.J.'s birthday, influenza-like illness, and bladder infection, but stating that school did not suspect that a single

(Footnote continued on next page.)

kindergarten, H.J. was absent from school for 34 days out of 175 total days, or nearly 20 percent of the school year. (H.J. Kindergarten Progress Report, Def. Ex. 88 at 152.) In first grade, H.J. was absent for 35 days of the school year. (H.J. 2012-2013 Grade 01 Report Card, Def. Ex. 183 at 274.) On February 4, 2014 – during the spring semester of H.J.'s second grade year – Darci Love, the principal of H.J.'s elementary school, sent a letter to H.J.'s parents notifying them that H.J. had missed 39 out of 102 possible school days, or nearly 40 percent of the school year up to that point. (Darci Love Letter, Def. Ex. 302 at 506, Feb. 4, 2014.) The absences were a consistent source of concern to the school staff, who worried that H.J. was falling behind her peers due to missing so many days of classes.

## II.    INTERVENTIONS AND 2013 SPECIAL EDUCATION EVALUATION

As a consequence of H.J.'s substantial number of absences, H.J. lagged behind her peers with respect to reading skills. (H.J. Grade 1 Benchmark Assessments, Def. Ex. 185 at 278.) To address H.J.'s academic performance, the School District initiated or attempted to initiate several interventions. First, the school offered Title I programming. In both kindergarten and first grade, H.J. received Title I services as an intervention to

_____
(Footnote continued.)

acute or chronic condition led to H.J. missing school because "[t]here were many different reasons"); *id.* at 843-46 (Test. of Brenda Duetz ("Duetz Test.")) (describing absences for fevers, coughs, colds, stomach aches, family medical concerns unrelated to H.J.'s health, and a broken toe); H.J. Analysis of Absences, Def. Ex. 377 at 793-94, May 9, 2014 (describing absences for "not feeling well," alleged strep throat, pink eye, vomiting, pertussis, severe cough and bronchitis, absence without excuse, counselor appointment, funeral, sinus procedure, and eye appointment).)

help her catch up to grade level in reading. (Progress Monitoring Improvement Report, Def. Ex. 89 at 155-57; Title 1 Parent/Student/Teacher Compact, Def. Ex. 95 at 166, Aug. 27, 2012.) The intervention was largely successful. One of H.J.'s teachers explained that "[a]fter [H.J.] had started Title I services, her progress exceeded the growth charts. Her growth was to be here, all of her data was exceeding that. She had no need for special education." (Tr. at 700:13-17 (Test. of Erica Hess ("Hess Test.")).)

Next, the District implemented an Individualized Health Plan ("IHP") for H.J. The IHP was initiated on March 28, 2012, to address H.J.'s asthma and stomachaches. (IHP, Def. Ex. 73 at 132-34, Mar. 28, 2012.) The plan included a doctor's diagnosis, goals for H.J. to learn to manage her own conditions, such as learning to use her inhaler on her own in the nurse's office, interventions and potential actions for the nurse to take, and expected outcomes. (*Id.*) The IHP was revised on February 13, 2014 to adjust the goals and interventions, as well as to add clothing accommodations for regulating body temperature at school. (IHP ("Revised IHP"), Def. Ex. 314 at 571-74, Feb. 13, 2014.) The revised plan lists "General Anxiety Disorder" as a "presenting problem." (*Id.* at 571.)

Additionally, the District attempted to get H.J. to attend Project Success, an after-school program in the District that meets two days a week, with bussing provided. (Tr. at 586 (Allen Test.).) The program targets reading, math, and social skills. (*Id.*) H.J.'s parents chose not to enroll her in Project Success but did not provide an explanation as to why not. (*Id.* at 587.) Finally, in October 2013, H.J.'s parents requested a special

education evaluation, which the District performed in December 2013 and found H.J. ineligible for special education under the IDEA.

## III.    2014 DUE PROCESS HEARING

On March 13, 2014, H.J.'s parents filed for a due process hearing.  (Compl., Ex. A (Due Process Hearing Decision ("ALJ Order")) at 1, June 23, 2014, Docket No. 1.)  The hearing was assigned to ALJ James Mortenson.  (*Id.*)  At the conferences before the hearing, the parties determined the following issues for the hearing:

1. Whether the School District failed to identify the Student as a possible child with a disability when it refused the Parents' requests for initial evaluation from kindergarten until October 2013?
2. Whether the School District failed to ensure the initial evaluation of the Student in December 2013 was sufficiently comprehensive to identify all of the Student's special education and related service needs?
3. Whether the Student is a child with a disability under the definition of "Other Health Disabilities" within Minnesota rules?

(*Id.* at 3.)

Based on these questions, the ALJ made several conclusions.  First, the ALJ concluded that the District failed to follow its own child find procedures in its Total Special Education System ("TSES") manual when concerns about H.J.'s academic performance and absenteeism presented throughout kindergarten, first grade, and second grade.  (*Id.*)  The ALJ also determined that "[t]he School District failed to ensure the initial evaluation of the Student in December 2013 was sufficiently comprehensive when it did not propose, conduct or otherwise obtain a medical assessment for diagnostic purposes related to the Student's physical conditions."  (*Id.*)  The ALJ concluded,

however, that "[t]he Parents did not show the Student is a child with a disability under the definition of 'Other Health Disabilities' within Minnesota Rules." (*Id.* at 4.)

As to the evaluation of H.J. in December 2013, the ALJ determined that it "was not sufficiently comprehensive to identify all of the child's special education and related service needs. The primary concern was Student's attendance. The question of why the Student was missing so much school was not addressed by the evaluation." (*Id.* at 14.) Further, the District "did not obtain, consider, and document medical information necessary to determine whether the Student may be eligible under the definition of OHD, or perform all of the other assessments necessary and examine the criteria for OHD." (*Id.*) Indeed, the ALJ found that "[t]he evidence the School District presented at [the due process] hearing about the eight [OHD] criteria was superficial and some witnesses contradicted themselves." (*Id.* at 17.) Rather than rely on this superficial and contradictory testimony, the ALJ concluded that "[a] medical diagnostic assessment is necessary to determine or rule out whether the Student has a chronic or acute health condition that is resulting in frequent absences. This assessment must be completed and signed by a licensed physician, pursuant to Minn. R. 3525.1335." (*Id.* at 15.)

One additional violation the ALJ found was that:

[T]he School District made its eligibility determination outside of the required team process, including the parents. A report was generated in December 2013 that concluded the Student was not eligible [for special education services], even though the team had not yet met. When the team met in February 2014 to discuss a variety of matters, the determination had already been made and was presented to the parents. They were not part of the discussion of eligibility. This was improper under the law.

(*Id.* at 14-15.)

As a result of these findings, the ALJ ordered the District to "provide for the independent verification of a medical diagnosis of a chronic or acute health condition and documented, systematic interview conducted by an independent licensed special education teacher with Student's prior classroom teachers and Student's parents within 45 calendar days of the date of this order." (*Id.* at 15.) The ALJ's order describes the requirements for an independent medical assessment by a licensed physician and notes that

> [i]f the team agrees the Student is eligible, an IEP [individualized education plan] team must be convened. Prior to the start of the 2014-2015 school year, an IEP would be developed to meet the Student's needs, particularly the provision of services when the Student cannot attend school as a result of a chronic or acute health condition.

(*Id.* at 16.) The ALJ went on to state that "[i]f the team agrees the Student is not eligible, no further action is required under this Order." (*Id.*)

The ALJ explicitly did not order compensatory education, explaining that "the Student has not suffered a loss of educational benefit necessary for a compensatory education award." (*Id.* at 18.) The ALJ described the situations in which compensatory education would be appropriate but found that "[h]ere, even if the Student were currently eligible under IDEA, her parents have not shown where she would have been, educationally, but for the alleged denial of FAPE [free appropriate public education]. Thus, no award of compensatory education is warranted." (*Id.*)

The District appealed the ALJ's ruling, and this matter is now before the Court on the parties' cross motions for judgment on the administrative record.

# ANALYSIS

## I.  STANDARD OF REVIEW

Under the IDEA, a party may seek review of an administrative decision by bringing an action in federal district court.  20 U.S.C. § 1415(i)(2)(A).  The Court must review the administrative proceedings, hear additional evidence if necessary, and determine whether the preponderance of the evidence shows that the District complied with the IDEA's requirements.  *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011).  The Court "may make a decision on the merits, even if there exist, upon the stipulated Record, disputed issues of material fact."  *Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580*, 259 F. Supp. 2d 880, 882 (D. Minn. 2003).  The party challenging the decision has the burden of proof.  *E.S. v. Indep. Sch. Dist. No. 196*, 135 F.3d 566, 569 (8th Cir. 1998).

"Although a district court should independently determine whether a child has received a FAPE, it must give 'due weight' to agency decision-making."  *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003).  This is because the ALJ had "'an opportunity to observe the demeanor of the witnesses and [also] because the court should not substitute its own educational policy for those of the school authorities that they review.'"  *Id.* (quoting *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000)).  This standard is less deferential than the substantial-evidence standard.  *Slama*, 259 F. Supp. 2d at 882.

A primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).

The Court must engage in a two-part inquiry when determining compliance with the IDEA. *K.E.*, 647 F.3d at 804. First, the Court must decide if the school district followed the IDEA's procedures. *Id.* Second, the Court must determine whether the student's education was "'reasonably calculated to enable the child to receive educational benefit.'" *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 795, 206-07 (2011)). Even if a school district violated IDEA procedures, it does not automatically follow that the school district has denied the student a FAPE. *Id.* Rather, a district's educational plan for a student will only be set aside for violating the IDEA's procedures "if the procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *See id.* at 804-05 (internal quotation marks and alterations omitted).

## II.    CHILD FIND AND EVALUATION OBLIGATIONS

In order to ensure that all children with disabilities receive a FAPE, school districts have a "child find" obligation. 20 U.S.C. § 1412(a)(3). Pursuant to this obligation, districts must ensure that:

> All children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A); *see also* Minn. R. § 3525.0750. Children with disabilities, as defined by the IDEA, are children who "need[] special education and related services." 20 U.S.C. § 1401(3)(A)(ii).

"[E]ither a parent of a child, or a State educational agency, other State agency, or local educational agency may initiate a request for an initial evaluation to determine if the child is a child with a disability." 20 U.S.C. § 1414(a)(1)(B). Even if a parent does not request an evaluation, a school district has an obligation "'to identify and evaluate all students who are reasonably suspected of having a disability.'" *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012) (quoting *P.P. ex rel. Michael P., West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009). Once a child is identified as potentially having a disability, the child's District "shall conduct a **full** and individual evaluation" to determine whether the child has a disability. 20 U.S.C. § 1414(a)(1)(A) (emphasis added); Minn. R. § 3525.2710, subp. 1; *see* Minn. R. § 3525.0800, subp. 3.

State law identifies the parameters of a school district's evaluation obligations. Under Minnesota law, if a parent requests a special education evaluation or the district suspects that a child has a disability, "[t]he district **shall** administer such tests and other evaluation materials as may be needed to produce the data identified by the IEP team" to determine whether a child has a disability. Minn. R. § 3525.2710, subp. 4(B) (emphasis added). The District must use a variety of assessment tools, and must assess the child in **all** areas of suspected disability. 20 U.S.C. §§ 1414(b)(2)(A)(i), (b)(3)(B); Minn. R. § 3525.2710, subps. 3(B)-(C).

## III. CHILD FIND VIOLATION

### A. Physician Examination Obligations Under Minnesota Rule 3525.1335

The School District challenges the ALJ's conclusion that the District should have obtained a medical assessment for H.J. Specifically, the District argues that a school's obligation to obtain a medical evaluation for a student is triggered only when the district strongly suspects that the student has an acute or chronic condition that is seriously interfering with their educational progress. Thus, the School District contends, it had no obligation to conduct a medical evaluation of H.J. because they did not have a strong suspicion that she had such a condition. For support, the District heavily relies on this Court's Order in *M.J.C. ex rel. Martin v. Special Sch. Dist. No. 1, Minneapolis Public Schools*, No. 10-4861, 2012 WL 1538339 (D. Minn. Mar. 30, 2012). The School District reads this Court's Order in *M.J.C.* as requiring a medical evaluation by the School District only because (1) the school knew the student was being evaluated for an ADHD diagnosis, (2) "[n]o one at the District seemed to doubt that M.J.C. had ADHD and was in need of services," *id.* at *2, and (3) the District was aware that a psychologist had diagnosed M.J.C. with a qualifying condition that, if the psychologist had instead been a licensed physician, would have entitled M.J.C. to special education services, *id.* at *2. Under this reading of *M.J.C.*, the District insists that it had no obligation to obtain a medical evaluation for H.J. because the District did not have a reason to suspect that H.J.'s absences were related to an acute or chronic medical condition. Indeed, the District alleges that the facts are actually to the contrary – that H.J. has not demonstrated that she did have an acute or chronic medical condition.

Minnesota Rule 3525.1335 requires a licensed physician to evaluate a student for a chronic or acute condition if the student meets at least three of eight OHD factors or criteria. Under the Rule, a student is "eligible and in need of special education instruction and services if the pupil meets" the following criteria:

(A)    There is: . . . written and signed documentation by a licensed physician of a medically diagnosed chronic or acute health condition . . . [and]

(B)    In comparison with peers, the health condition adversely affects the pupil's ability to complete educational tasks within routine timelines as documented by three or more of the following:

    (1)    **excessive absenteeism linked to the health condition**, for example, hospitalizations, medical treatments, surgeries, or illnesses;

    (2)    specialized health care procedures that are necessary during the school day;

    (3)    medications that adversely affect learning and functioning in terms of comprehension, memory, attention, or fatigue;

    (4)    limited physical strength resulting in decreased capacity to perform school activities;

    (5)    limited endurance resulting in decreased stamina and decreased ability to maintain performance;

    (6)    heightened or diminished alertness resulting in impaired abilities, for example, prioritizing environmental stimuli; maintaining focus; or sustaining effort or accuracy;

    (7)    impaired ability to manage and organize materials and complete classroom assignments within routine timelines; or

    (8)    impaired ability to follow directions or initiate and complete a task.

*Id.* (emphasis added). Although the District's special education evaluation mentioned that excessive absenteeism was a concern for H.J., the evaluation did not attempt to construct an explanation for it or connect it to any particular condition or disability. The

District had also created an individualized health plan for H.J., requiring specialized health care procedures throughout the day to address H.J.'s asthma. *See id.*, subp. 2(B)(2). Despite a report from one of H.J.'s teachers that H.J. "needs to hear all directions numerous times" and that her anxiety and agitation tended to distract her from her school work, the School District's evaluation of H.J. did not analyze whether H.J. suffered from "impaired ability to follow directions or initiate and complete a task," *id.*, subp. 2(B)(8), or "diminished alertness resulting in impaired abilities, for example, prioritizing environmental stimuli; maintaining focus; or sustaining effort or accuracy," *id.*, subp. 2(B)(6). In other words, even though the District had observed and received reports that H.J. may have a health condition that adversely affects her ability to complete educational tasks, the District's special education evaluation did not discuss any of the other criteria to indicate whether H.J. satisfied at least three of the eight OHD criteria, triggering the need for a medical assessment.

The School District maintains that it was H.J.'s burden to prove at the due process hearing that she met at least three of the eight criteria, and she did not meet that burden. "[W]hen there is insufficient evidence on a particular issue, that issue must be resolved **against** the party who bears the burden of proof." *United States v. 15 Bosworth Street*, 236 F.3d 50, 55 (1st Cir. 2001). The District argues that because H.J. presented insufficient evidence on this issue at the due process hearing, and because *M.J.C.* does not require a medical evaluation unless the School District knows the student has been diagnosed with a condition that interferes with his or her schoolwork, the ALJ should not have ordered the District to provide the medical evaluation anyway.

First, the School District misreads this Court's ruling in *M.J.C.*  In that case, the Court did not find that a school district only needs to medically evaluate a student when it is essentially a foregone conclusion that the evaluation will yield a diagnosis of an acute or chronic condition.  Rather, the Court found that a medical evaluation was appropriate and necessary when the school district was aware that a child was struggling in school and knew that the child was seeing a medical professional for a potentially OHD-eligible condition.  *M.J.C.*, 2012 WL 1538339, at *2-*3, *9.  In this case, just as in *M.J.C.*, the School District knew the student was struggling in school – here, likely by virtue of excessive absenteeism.

Further, the School District knew that H.J. had been evaluated for, and indeed, diagnosed with, Generalized Anxiety Disorder ("GAD").  As the ALJ noted, the record makes clear that the District received the report diagnosing H.J. with GAD and that the report hypothesized that the condition might be interfering with her ability to attend and focus on school.  (ALJ Order at 14.)  Armed with this information and the parents' request for a special education evaluation, the School District had reason to suspect that a medical evaluation might provide critical information for the purposes of a special education determination.

Second, the Court recognizes that a medical evaluation may ultimately show that H.J. does not suffer from an acute or chronic condition that explains her absenteeism, or the District may conclude that H.J. does have a condition but it has not resulted in any loss of educational benefit.  In either of those cases, the District would likely not be required to provide H.J. with any specialized services.  *See Fort Osage R-1 Sch. Dist. v.*

*Sims ex rel. B.S.*, 641 F.3d 996, 1004 (8th Cir. 2011). Because the District's special education evaluation of H.J. did not indicate that the team had adequate physician evaluations to reach a decision, however, *K.E.*, 647 F.3d at 805, or that the team had considered all of the OHD criteria and determined that H.J. was not eligible under them, it is not yet certain whether H.J. is entitled to specialized instruction or whether she has received a FAPE from the School District. As a result, the Court finds that the School District committed a child find violation by failing to fully evaluate H.J.

### B.  Harmless Error

The School District argues that even if they did commit a procedural violation by failing to comply with their child find obligations, the violation is not actionable because it constitutes harmless error. The Eighth Circuit has held that procedural violations of the IDEA are evaluated under a harmless error standard. *See, e.g.*, *Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011) (quoting *Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010)). Even if a procedural violation of the IDEA is found, a child's "IEP is set aside 'only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'" *Id.* (quoting *Gray*, 611 F.3d at 424); *see also* Minn. Stat. § 125A.091, subd. 28.

The District cites to several cases from other circuits describing school districts' child find obligations as "procedural." *See, e.g.*, *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010); *Bd. of Educ. of Fayette Cnty., Ky. v.*

*L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). The Eighth Circuit has not squarely ruled on whether a child find violation is a "procedural" violation, but the School District points to the Eighth Circuit's explanation in *Dass* as to when an IEP will be set aside and argues that the District's actions in this case do not rise to that level. The School District maintains that because any child find violation in this case was merely a procedural error that did not result in detrimental consequences to H.J., the Court should treat it as harmless error.

Having thoroughly reviewed the administrative record in this case, the Court cannot conclude that the School District's child find violation constituted harmless error. First, H.J. has missed extensive amounts of school due to what her parents have alleged is a weakened immune system and her GAD condition. The District's failure to consider those conditions when assessing H.J. for special education may mean that the District missed impairments that may require specialized services for H.J. to receive adequate educational benefit. Further, by simply indicating that H.J. did not qualify for special education, without fully considering the OHD criteria in December 2013, two months before the IEP team actually met to discuss H.J.'s eligibility for special education, the District's child find process prevented H.J.'s parents from fully participating in the process of determining the appropriate level of services or her eligibility. As a result, the Court will find that the School District's child find violation was not harmless error.

## C.    Alleged Procedural Errors

Finally, the District argues that the ALJ's conclusions should be overturned because the ALJ made several procedural errors.[3]  First, by finding that the District's failure to medically evaluate H.J. hampered her parents' ability to prove a link between her absenteeism and a disability, the School District contends that the ALJ "inverted the burden of proof."  *See M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 458-59 (8th Cir. 2008) (describing that it is reversible "error to assign the burden of persuasion to a Minnesota school district in an action to enforce the procedural and substantive requirements of the IDEA.");  *15 Bosworth Street*, 236 F.3d at 55 (explaining that it "constitutes reversible error" to "g[i]ve lip service to the accepted allocation of the burden of proof, and effectively invert[] that burden.").  The ALJ found that the parents did not meet their burden of showing that H.J.'s absenteeism should be addressed through specialized instruction, nor did they prove where H.J. would be performing but for an alleged denial of FAPE.  (ALJ Order at 17.)  The District argues that by finding the District liable anyway, due to a lack of medical evidence for the District's evaluation, the ALJ impermissibly shifted the burden onto the District.  *See, e.g.*, *D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 Fed. App'x 887, 893 (5th Cir. 2012) ("IDEA does not penalize

---

[3] One procedural violation the District alleges is that the ALJ allowed the parents to submit their evidence a day late and should therefore have either prohibited the introduction of that evidence or started the hearing a day late to offer the District five full days before the due process hearing to evaluate the parents' evidence.  *See* 34 C.F.R. § 300.512(a)(3).  Because the Court finds no indication that the District was prejudiced in its ability to present its case to the ALJ, the Court will reject the argument that the ALJ's order should be overturned on these grounds.

school districts for not timely evaluating students who do not need special education.")
(citing *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir.
2003) ("[P]rocedural defects alone do not constitute a violation of the right to a free
appropriate public education unless they result in the loss of an educational opportunity."
(alterations omitted))).

The District's argument is well taken, but the Court finds that it is not on point
here. Although the School District would be correct if the ALJ had found a denial of
FAPE, that was not the ALJ's conclusion. Indeed, the ALJ specifically denied H.J.'s
request for compensatory education, which would have been an appropriate substantive
remedy had the parents met their burden of showing a denial of necessary specialized
services. (*See* ALJ Order at 18.) Rather, the ALJ made a limited determination that there
were serious procedural errors in the District's special education evaluation – namely, the
failure to obtain sufficient medical information to assess H.J. for special education
adequately, the failure to analyze the OHD criteria, and the predetermination that H.J.
was not eligible for special education before the IEP team met, preventing H.J.'s parents
from having a meaningful opportunity to participate in the special education evaluation.
(*Id.* at 14-18.)

In light of these "egregious" procedural violations that "seriously infringe on the
parents' opportunity to participate in the IEP formulation process," *M.L. v. Fed. Way Sch.
Dist.*, 394 F.3d 634, 645 (9th Cir. 2004), the ALJ ordered a procedural remedy, designed
to bring the District's special education evaluation in line with state and federal
procedural requirements. The School District protests that the "IDEA does not penalize

school districts for not timely evaluating students who do not need special education," *D.G.*, 481 Fed. App'x at 893, but it was impossible to know whether H.J. needs special education due to the procedural errors in the evaluation process. Therefore, the Court will order the School District to remedy the procedural errors so that the record accurately reflects H.J.'s needs.

The second major procedural violation the District alleges is that the ALJ considered evidence submitted after the due process hearing, including the District's TSES manual, which describes the District's child find policies. Specifically, the District maintains that a due process hearing is limited to the issues presented by the parties and framed by the ALJ at the prehearing conference. *See K.E. v. Indep. Sch. Dist. No. 15*, No. 09-2433, 2010 WL 2132072, at *16 (D. Minn. May 24, 2010) ("[N]othing in the [Minnesota] statute gives an ALJ the authority to decide issues not raised by the parties."). By separately requesting the District's TSES after the hearing ended and then evaluating the District's compliance with that policy, the School District alleges that the ALJ expanded the scope of the issues beyond his authority.[4]

---

[4] The District maintains that this is also a direct violation of the Minnesota Administrative Rules. Minn. R. 3525.4320, subp. 2 ("All evidence to be considered in [a due process hearing] must be offered and made a part of the record in the case. The hearing officer must not consider any other factual information or evidence in the determination of the case. This does not prohibit the hearing officer from questioning witnesses or seeking other evidence from the parties and directing them to provide it.") The Court concludes that this was an instance of a hearing officer directing the parties to provide additional information. Although the TSES manual would ideally have been requested during the hearing, the Court finds no evidence that the District was prejudiced by the minor delay in the ALJ's effort to obtain information that was obviously relevant to this case.

The Court is not persuaded by this argument. The issues identified for resolution at the hearing included "[w]hether the School District failed to ensure the initial evaluation of the Student in December 2013 was sufficiently comprehensive to identify all of the Student's special education and related service needs." (ALJ Order at 3.) As such, the School District was well aware that the ALJ was scrutinizing the District's evaluation methods. The Court recognizes that the ALJ should, ideally, have requested the TSES manual before the end of the hearing, but there is no indication that the District was prejudiced by the delay. The District could reasonably anticipate that the ALJ might want to see the District's description of its child find methods. Further, the ALJ's conclusions were based on Minnesota Administrative Rules and the Code of Federal Regulations; the ALJ did not order a medical assessment based on the District's failure to comply with its TSES. (*See id.* at 14-16.) As a result, the Court does not find any prejudice to the School District from the ALJ's delay in requesting a copy of the TSES manual.

Finally, the District argues that the ALJ erred by relying on events from more than two years prior to the date on which H.J. filed for a due process hearing, which fell outside the statute of limitations for IDEA violations. 20 U.S.C. § 1415(b)(6)(B) (requiring "[a]n opportunity for any party to present a complaint . . . which sets forth an alleged violation [of the IDEA] that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint . . . ."). No party may recover for a violation occurring outside the two-year statute of limitations. *See C.B. ex rel. B.B. v. Special Sch. Dist. No. 1,*

*Minneapolis, MN*, 636 F.3d 981, 989 (8th Cir. 2011); *Gray*, 611 F.3d at 428.  In this case, H.J.'s parents filed for a due process hearing on March 13, 2014.  (ALJ Order at 1.)  The School District contends that this sets the relevant date for the statute of limitations.  The District argues that by considering evidence from the beginning of H.J.'s kindergarten year in the fall of 2011, then, the ALJ allowed H.J. to circumvent the statute of limitations.  In doing so, the School District alleges, the ALJ compromised the District's settlement position.

The Court will also reject this argument.  The heart of the ALJ's finding was that the October 2013 evaluation was flawed and not sufficiently comprehensive, constituting a child find violation.  The parents filed for a due process hearing on March 13, 2014, well within the two year statute of limitations established by the IDEA.  The School District offers no support for the contention that the ALJ cannot consider evidence arising from before the statute of limitations, so long as the violation was found to take place during the two years preceding the date on which the District knew of the alleged violation – in this case, March 13, 2014 at the latest.  References in the ALJ's order to facts and issues during H.J.'s kindergarten and first grade years are not conclusions that the School District violated the IDEA at those times, but rather observations that the School District was likely aware, at the time it conducted a special education evaluation of H.J., that these facts and issues formed H.J.'s history.  Because the ALJ concluded that the child find violation occurred after the October 2013 special education evaluation request and the due process hearing took place in 2014, the Court finds no procedural error by the ALJ in this respect.

Because the Court concludes that none of these alleged procedural violations interfered with the School District's ability to present its case or prejudiced the District in any other way, the Court will affirm the ruling of the ALJ. The Court will order the District to conduct a re-evaluation of H.J. – including the parents in the discussion of H.J.'s eligibility and obtaining a medical diagnostic assessment – pursuant to Minnesota Rule 3525.1335, in order to obtain a comprehensive picture of H.J.'s conditions and abilities.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment on the Administrative Record [Docket No. 28] is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment on the Administrative Record [Docket No. 33] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 11, 2015
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
Chief Judge
United States District Court